J-A22013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: R.L.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF R.L.M., FATHER, | |
| Appellant | No. 583 MDA 2015 |

Appeal from the Decree March 6, 2015
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): A-8247

BEFORE:  BOWES, JENKINS, AND PLATT,* JJ.

MEMORANDUM BY BOWES, J.:                **FILED AUGUST 25, 2015**

R.L.M. ("Father") appeals from the decree entered on March 6, 2015, wherein the trial court granted the petition of M.N.M. ("Mother") to involuntarily terminate his parental rights to their then-seven-year-old daughter, R.L.W.  We affirm.

During July 2007, R.L.W. was born in Mecklenburg County, Virginia. Mother and Father are both from Pennsylvania originally and the couple resided in Pennsylvania prior to R.L.W.'s birth.  After Mother discovered that she was pregnant with R.L.W., she moved to her parents' ("Maternal Grandparents") home in Bracey, Virginia.  Father followed Mother to Virginia and resided with her at Maternal Grandparents' home for the first five

---

\* Retired Senior Judge assigned to the Superior Court.

months of R.L.W.'s life. Father's relationship with Mother soon soured and he moved from the Maternal Grandparents' residence when his daughter was approximately five months old. He remained in Virginia for an additional month before returning to Pennsylvania during early 2008.

Prior to leaving Virginia, Father agreed that he would visit with R.L.W. at least once per month. However, he has not had any contact with his daughter since he left Virginia when she was six months old. Indeed, Father's total effort to preserve a relationship with R.L.W. consisted of a single text that he sent to Mother during 2009, asking without any advanced warning, that she drop off the then-two-and-one-half–year-old child at his hotel room in Virginia. Father failed to send R.L.W. gifts, correspondence, or financial support. He claimed to have mailed a gift on one occasion during 2012, but it was returned undeliverable. Father never instituted a custody action or made any other concerted efforts to visit R.L.W. While he now complains that he could not locate Mother after she moved from Bracey and changed her telephone number, Father concedes that he failed to communicate with Maternal Grandparents, whose contact information remained unchanged.

During 2011, Mother petitioned a Virginia court to have R.L.W.'s name changed to match Mother's maiden name. Father was served notice of the petition, but he neglected to appear for the scheduled hearing or object to

the petition. The court granted the unopposed petition, and the Virginia Department of Health updated the child's birth certificate.

Meanwhile, following Father's departure, Mother remained in Bracey for approximately three years before moving to Richmond, Virginia, briefly, and then moved to Luzerne County, Pennsylvania with her current husband, J.L.M. Mother and R.L.W. have resided with J.L.M. since December 2011. The couple married on May 5, 2012. R.L.W shares a close parent-child bond with J.L.M., whom she identifies as her birth father.

On August 28, 2014, Mother filed a petition to terminate Father's parental rights. The petition identified J.L.M. as the prospective adoptive parent who would assume Father's legal role as a parent if the petition were to be granted. During the ensuing evidentiary hearing, Father conceded that he had not interacted with his daughter in any manner since she was six months old. However, he asserted that Mother, J.L.M., and Maternal Grandparents erected a series of obstacles to block his efforts to maintain communication with her. The trial court made a credibility determination against Father and in favor of Mother and her witnesses. Essentially, the court found that, even if Mother and her family thwarted Father's initial attempts to maintain a relationship with R.L.W., he did not make a concerted effort to overcome those obstacles. The trial court reasoned, "The efforts made by Father, if any, were in 2008-2009. Subsequent to those years, Father's efforts were practically non-existent. Father did not continue

to exert himself to take and maintain a place of importance in the child's life . . . Father essentially failed to perform his parental duties." Trial Court Opinion, 4/27/15, at 10.

On March 5, 2015, the trial court entered a decree terminating Father's parental rights pursuant to § 2511(a)(1) and (b). Father filed a timely appeal and a concomitant Rule 1925(b) statement asserting six redundant issues that he reiterates on appeal as follows:

> A. Did the Honorable Jennifer L. Rogers abuse her discretion and commit errors of law as follows: in finding that the Appellant has refused or failed to perform his parental duties; in finding that the entry of a Decree terminating the parental rights of the Appellant would be in the best interests of the minor child, R.L.W.; and in finding that the entry of a Decree terminating the parental rights of the Appellant would have a positive effect on the welfare of the minor child, R.L.W.?
>
> B. Was there insufficient evidentiary support for the Honorable Jennifer L. Rogers to find as follows: in finding that the Appellant has refused or failed to perform his parental duties; in finding that the entry of a Decree terminating the parental rights of the Appellant would be in the best interests of the minor child, R.L.W.; and in finding that the entry of a Decree terminating the parental rights of the Appellant would have a positive effect on the welfare of the minor child, R.L.W.?

Father's brief at 4.

We review the trial court's order to grant or deny a petition to involuntarily terminate parental rights for an abuse of discretion. *In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa.Super. 2011). "We are limited to determining whether the decision of the trial court is supported by competent evidence." *In re R.L.T.M.*, 860 A.2d 190, 191 (Pa.Super. 2004) (quoting *In re C.S.*,

- 4 -

761 A.2d 1197, 1199 (Pa.Super. 2000)). However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re C.W.U., Jr.*, *supra* at 4. As the ultimate trier of fact, the trial court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id*.

As the party petitioning for termination of parental rights, Mother "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989).

Requests to involuntarily terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts. In *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

Herein, the certified record supports the trial court's determination that Mother established the statutory grounds to terminate Father's parental

rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). As it relates to §2511(a)(1), the pertinent inquiry for our review follows:

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. . . . Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re D.J.S.*, 737 A.2d 283, 285 (Pa.Super. 1999) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)) (internal citations omitted). Although the six months immediately preceding the filing of the petition are the most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re B.,N.M.*, 856 A.2d 847 (Pa.Super. 2004). Additionally, to the extent that the trial court based its decision to terminate parental rights pursuant to subsection (a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." In *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), we explained, "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available

resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship."

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must then engage in three additional lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008).

Instantly, Father's arguments focus on the alleged impediments that Mother used to thwart his efforts to maintain a relationship with R.L.W. Father asserts that, as early as 2009, Mother adopted the position that she would not permit him to be involved in their child's life. He also notes that Mother moved from Virginia to Pennsylvania without informing him of her new address or telephone number. Finally, Father challenges Mother's decision to forgo informing R.L.W. of his existence or revealing to R.L.W. that he was her birth parent.

After a thorough review of the parties' briefs, pertinent law, and the certified record, we conclude that the Honorable Jennifer L. Rogers cogently and accurately addressed Father's arguments in her well-reasoned opinion entered on April 27, 2015. Therefore, we affirm on the basis of that opinion.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/25/2015

IN RE:                          :        IN THE COURT OF COMMON PLEAS
                                :        OF LUZERNE COUNTY
R.L.W.                          :
                                :        ORPHAN'S COURT DIVISION
                                :        Adoption Nos. 8247
                                :
                                :        583 MDA 2015

## MEMORANDUM ISSUED PURSUANT TO PA. R.A.P. 1925 (a)

### I.   PROCEDURAL HISTORY

Petitioner Megan N. Matthews (Mother) is the natural mother of the child, R.L.W., and Petitioner, John L. Matthews, is Mother's husband and step-father of the child. On August 28, 2014, Mother and Mr. Matthews filed a Petition for Involuntary Termination of Parental Rights (Petition) addressing Ryan Lee McCrum, (Father) the child's natural father. A hearing was held on February 4, 2015, and on March 5, 2015, the Court entered a decree terminating the parental rights of Father. Particularly, Father's parental rights were terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1). In entering the decree, the Court gave primary consideration to the developmental, physical, and emotional needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(b).

Father filed a Notice of Appeal to the Superior Court on March 30, 2015. Father's Statement of Matters Complained of on Appeal, states that the Trial Court abused its discretion and committed errors of law as follows:

(1)   In finding that the Respondent has refused or failed to perform his parental duties;

(2)   In finding that the entry of a Decree terminating the parental rights of the Respondent would be in the best interests of the minor child, R.L.W.

(3)    In finding that the entry of a Decree terminating the parental rights of the Respondent would have a positive effect on the minor child, R.L.W.

In addition, Father avers that there was insufficient evidence to support the findings in (1)-(3) in the above paragraphs.

## II.    FINDINGS OF FACT

The minor child, R.L.W. was born on July 17, 2007.  R.L.W. is currently seven (7) years old.  The appeal involves the proposed termination of Father's parental rights.

It is unrebutted that the Father has not seen R.L.W. since the child was six (6) months old.  The child has been residing with Mother and the maternal grandparents since birth until 2011 and with Mother and the step-father, John L. Matthews from December of 2011 until the present. N.T. 2/4/2015 at 6, 95, 169.

In meeting their requisite burden of proof by clear and convincing evidence regarding the termination of Father's parental rights, Mother and Mr. Mathews testified on their own behalf, in addition to the maternal grandmother, Linda Lewis testifying on their behalf.  Father testified on his own behalf.

## III.    CONCLUSIONS OF LAW

After consideration of the credible evidence as summarized above and more detailed below, the Court concludes:

(1) Petitioners have shown by clear and convincing evidence that the parental rights of the Father to the minor child, R.L.W. should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(1).

(2) Petitioners have shown by clear and convincing evidence that the termination of the parental rights of Father, to his minor child, R.L.W.,

2

best serves the needs and welfare of the child pursuant to 23 Pa. C.S.A. Section 2511(b).

## IV.   DISCUSSION: GROUNDS FOR TERMINATION

The General rule under Pa.R.A.P. 1925(a)(1) entitled "Opinion in Support of Order" states:

"Except as otherwise prescribed by this rule, upon receipt of the notice of appeal, the judge who entered the order giving rise to the notice of appeal, **if the reasons for the order do not already appear of record**, shall forthwith file of record **at least a brief opinion** of the reasons for the order, or for the rulings or other errors complained of, **or shall specify in writing the place in the record where such reasons may be found.**" (emphasis added)

The statute permitting involuntary termination of parental rights in Pennsylvania, 23 Pa. C.S.A. Section 2511, sets forth the certain irreducible minimum requirements of care that parents must provide to their children. Termination of parental rights is an issue of constitutional dimensions because of the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met. *Santosky v. Kramer*, 455 U.S. 745 (1982), *In Re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). However, as the Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: J.A.S., Jr.*, 2003 Pa. Super. 112, (*citing In the interest of Lillie*, 719 A.2d 327 (Pa. Super 1998))

A court may terminate parental rights under Section 2511(a)(1) when:

3

The parent by conduct continuing for a period of at least six months immediately preceding the filing of the Petition has either evidenced a settled purpose of relinquishing parental claim to a child **OR** has refused or failed to perform parental duties. (emphasis added)

Parental duties are multifaceted. The Pennsylvania Superior Court has addressed the issue in *In re Shives,* 363 Pa. Super. 225, 525 A.2d 801, 802 (1987) (*citing In re Burns,* 474 Pa. 615, 379 A.2d 535 (1977)):

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child . . . These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child . . . the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.*

A parent must demonstrate a continuing interest in the child and make a genuine effort to maintain communication and association with the child. *In re Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975). Appellate courts have set forth a very strict standard for measuring a parent's performance of parental duties. A parent must exert himself to take and maintain a place of importance in a child's life and a continuing duty to love, protect and support his child and to maintain communication and association with the child even after separation. He must pursue a course of conduct consistently aimed at maintaining the parental relationship. *In re Adoption of M.J.H.,* 501 A.2d 648 (Pa. Super. 1985); *In re V.E.* 611 A. 2d 1267 (Pa. Super. 1992); and *Adoption of S.H.,* 383 A.2d 529 (Pa. 1978).

4

Mother testified that Father has not seen the child since the child was six (6) months old. Mother also testified that R.W. is seven (7) years old and her date of birth is July 17, 2007. N.T. 2/4/15. Mother stated that in 2007, she and Father resided with R.L.W. and the maternal grandparents in Bracey, Virginia for a period of five (5) months after the child's birth. *Id.* at 5-6. Mother further testified that when Father resided with the maternal grandparents, he did not help in taking care of the baby. *Id.* at 6. Mother stated that her parents offered Father a job and provided food and shelter for Father; however, Father did not appreciate her parents' generosity. *Id.* at 36.

Mother then testified that five (5) months after the child's birth, Father moved out of her parents' residence and remained in Virginia for one additional month during which he resided with his employer. During that one month period, Mother testified that she would take the child to see Father for one hour per week. *Id.* at 8. She testified in January 2008, Father saw the child a total of 4-5 times. *Id.* at 31. Also, Mother testified that she believed that Father had an alcohol problem and did not trust him to drive with the child; therefore, she always transported the child for visitation with Father. Mother also testified that Father was arrested twice for driving under the influence of alcohol, the first time, prior to the child's birth, and the second time in or around 2011. *Id.* at 56.

Father disputed Mother's testimony by stating that Mother did not bring the child to him for visits in January of 2008. Instead, Father testified that he saw the child three (3) times after he moved out. He stated the first time he took the child to the mall to take pictures with Santa Claus. The second time, he had the child for one hour on Christmas day and the third time, he met Mother and the child at Denny's restaurant. He subsequently moved to Pennsylvania. *Id.* at 138-139

5

Father further testified that a reason his relationship with Mother failed was Mother and the maternal grandmother did not want Father's family to visit the child in Virginia. He testified that his father and stepmother came to visit for a weekend and subsequent to said visit, when they were still an intact family, Mother and grandmother complained every time his family members wanted to return. *Id.* at 130-133 Mother testified that her problem with Father's family was that when they visited in Virginia, they drank alcohol excessively and were inebriated all weekend. *Id.* at 204

After the child was six (6) months old, Mother testified that Father moved to Pennsylvania and had an agreement with Mother that he would see the child every weekend, in addition to sending financial support to the child. Father also admitted that he had not seen the child since she was six (6) months old; however, Father averred that he told Mother he would visit once per month not every weekend. *Id.* at 145-46. Assuming *arguendo*, that Father did tell Mother that he would only see the child once per month, Father did not visit the child one weekend per month, nor did Father send any financial support for the child. Mother testified that Father left Mother without giving Mother his cell phone number or providing Mother with his new address. *Id.* at 8. Mother testified that in or around March of 2008, she received a text message from Father asking for the child's social security number for health insurance purposes. However, Mother did not provide Father with the child's social security number. *Id.* at 9. In 2009, when the child was 2½ years old (after Father has not seen the child in two (2) years) Mother stated she received a text message from Father, without any advance warning, requesting that she bring the child and drop off the child at his hotel room in Virginia. Mother refused to drop off the child and leave the child with Father in light of the fact that the child would not have recognized Father as a parent. *Id.* at 10.

In December of 2011, Mother filed a name change petition requesting to have the child's last name changed to her Maiden name. Although Father was served with the Petition, Father did not appear for the hearing. *Id.* at 12. After Father moved from Virginia to Pennsylvania in January of 2008, Father did not send any gifts, cards or money to the child. Father did not further attempt to contact the child on holidays and on the child's birthdays. As stated above, Father has not seen the child from 2008 until the present. *Id.* at 17. Father testified that once in 2012, he sent Christmas gifts to the child in Suffolk Virginia, believing that Mother resided at that address, but the gifts were returned to him. *Id.* at 173.

Mother testified that Father left Virginia in January of 2008, and that she had the same cell phone number until December of 2011. Thereafter, she and her husband decided to obtain a new phone number with a family plan. Mother testified that between 2008 and 2011 (other than the one request made by Father to see the child in 2009) Father did not request to see the child. *Id.* at 49-50. Mother testified that in December of 2011, she did not advise Father of her new cell phone number; however, she testified that Father knew her parents' address in Virginia and their phone number which has not been changed. *Id.* at 51-52

Ms. Lewis, the maternal grandmother, corroborated Mother's testimony. Ms. Lewis testified that Father lived with Mother and the child for five (5) months after the child's birth. *Id.* at 69 Ms. Lewis testified that while Mother was pregnant, Mother moved from Pennsylvania to Virginia. Afterwards, Father quit his job in Pennsylvania and followed Mother to Virginia to stay at the maternal grandparents' home. According to the maternal grandmother, the maternal grandparents allowed Mother and Father to reside with them and helped Father obtain employment. Ms. Lewis testified that while

7

Father was residing in her residence, he would wake up at 6:30 a.m. for work and return home by 5:30 p.m. However, Father was not involved with the child and did not help Mother in taking care of the child. Ms. Lewis described Father as an "absent" father. Ms. Lewis testified that Mother was the one that took care of the baby at night and during the day. *Id.* at 70.

Ms. Lewis further corroborated Mother's testimony by stating that after Father moved out of their residence, Mother remained residing with them for 3-4 years until Mother moved to Richmond, Virginia to commence school. *Id.* at 73 Ms. Lewis testified that two and one half years after Father moved to Pennsylvania, Father texted Mother to have the child dropped off at his hotel room. Ms. Lewis testified that she saw the text message sent by Father. *Id.* at 74, 92. Ms. Lewis further testified that over the years, she and the maternal grandfather were never contacted by Father requesting Mother's address or contact information. The maternal grandparents have always resided at the same address. *Id.* at 76. Father further admitted that over the years, he did not contact the maternal grandparents' residence in attempt to locate Mother and the child. *Id.* at 172.

Based on the testimony given, the Court finds that Father has refused or failed to perform his parental duties six (6) months prior to the filing of the Petition for Termination of Parental Rights. Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Title 23 Pa.C.S.A § 2511 (b). *In re: Z.S.W.,* 946 A.2d 726, 730 (Pa. Super. 2008)

8

With grounds for termination under Title 23 Section 2511 (a)(1), **the first line of inquiry** as aforementioned, is the parent's explanation for his or her conduct. Father testified that in 2008 after he moved to Pennsylvania, he attempted on three (3) occasions in February, March and April of 2008 to contact Mother in effort to see the child; however, in February 2008, Mother refused to let him see the child. On the other two occasions, he claimed that he went to the maternal grandparents' residence in Virginia and both times, the maternal grandmother told him to leave the residence. *Id.* at 153.)

Father then averred that in 2009, when the child was 2½ years old, he texted Mother and asked if he could see the child and Mother agreed by text. Father alleged that he drove to Virginia and went to a hotel and texted Mother to bring the child to the hotel. However, Mother would not reply to his text messages. *Id.* at 154-155. As stated above, Mother disputed Father's testimony and claimed that Father did not contact her in advance to see the child, but called her and wanted her to bring the child to a hotel in Virginia, when Father had not seen the child since she was six (6) months old.

Father claimed that he texted Mother mostly once per month and Mother would reply that he would never see the child. *Id.* at 153. Mother denied that she was contacted by Father to see the child other than one time in 2009. *Id.* at 202-203.

Father also testified that in 2012, he mailed Christmas presents to the child in Suffolk Virginia, believing the address to be Mother's residence, but the presents were returned. Father further admitted that he did not mail any letters or cards to the child at any other time. Father admitted that from 2009 until the present, he did not contact the maternal grandparents to inquire about the Mother and R.L.W. *Id.* at 172-173

9

Father also testified that he did not institute a custody action because he did not have the financial means to do so. However, Father admitted that in 2011 when he was arrested for Driving Under the Influence, he hired an attorney and paid him $1,000.00 to represent him in that matter. Father claimed that he was forced to hire an attorney because the judge instructed him to do so. *Id.* at 184-186. On the other hand, with respect to his own child, Father merely had a passive interest in seeing the child over a period of seven (7) years. Although Father may have originally made a genuine effort to maintain communication and interaction with R.L.W., Father gave up quickly. The efforts made by Father, if any, were in 2008-2009. Subsequent to those years, Father's efforts were practically non-existent. Father did not continue to exert himself to take and maintain a place of importance in the child's life. It was Father's parental duty to do so. It is not Mother's duty to insure that Father maintains interest in his child. Father essentially failed to perform his parental duties.

The Court further agrees with the Guardian Ad Litem's rationale as follows:

> I do believe that there was some efforts made by Dad after the initial break-up in trying to see R.L.W. (initial used) and, perhaps, even though those efforts might have been thwarted by Mom and her family; but, I still think that too much time has passed and not enough has been done by Dad; and, I do believe that if this Petition for Termination wasn't filed, he'd still just be out there and R.L.W. (initial used) would have no knowledge of who her father was, because there would be no efforts made to reunite himself with her.

When Father was asked why he did not attempt to contact his child between 2011 and August of 2014, Father's response was that he was working and saving money. He further stated that after 2012, he was texting and calling Mother on her cell phone number. However, Mother testified that at the end of 2011, Mother changed her cell phone number and her number was no longer operative. Therefore, Father could not

10

have been texting and calling Mother after 2012. This Court does not find Father credible in his testimony and believes that Father slept on his rights as a Father.

Furthermore, when given a chance to appear at the hearing and oppose the child's name change in 2011, Father did not appear, claiming that he did not have a driver's license to drive to the hearing. However, when questioned as to the reason he did not use public transportation, Father did not have an adequate response. Father also did not write to the Court to oppose the name change. He stated he believed that it was simply a petition that would not result in the child's name change. *Id.* at 195.

The **second line of inquiry** is the post-abandonment contact between parent and child. It was established on the record by both Mother and Father that Father has not had any contact with the minor child since the child was six (6) months old. Thus, there was a gross excess of six months post last contact between Father and the minor child. N.T. 2/4/2015 at 169.

The **third line of inquiry**, as stated in *In re: Z.S.W.* requires the Court to review the evidence in support of termination under Title 23 Pa.C.S.A Section 2511 (b). The Court must determine whether the termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child. *In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect of permanently severing that bond. *Id.*

The Court finds that the child's physical needs are met by Mr. Mathews. Mother testified that she does not work outside the home and Mr. Matthews is the sole provider for the household. Mother and Mr. Matthews were married on May 5, 2012 and they

11

have been residing together with the child since December of 2011. N.T. 2/4/2015 AT 207. Ms. Lewis, the maternal grandmother, described Mr. Mathews as an "excellent" caregiver. She testified that he provides a good home, food and clothing for the family. *Id.* at 77.

The Court finds that Father also meets the child's developmental needs. Mother testified that when Mr. Matthews is home, he helps R.L.W. with her homework, especially with Math. *Id.* at 209. The child also helps Mr. Matthews and Mother with planting in the garden. Mr. Matthews testified that he takes R.L.W. with him to the office where she plays and colors with her crayons. *Id.* at 221-222.

The Court also finds that Mr. Matthews meets the child's emotional needs. Mother testified that Mr. Matthews plays with the child many times and takes her to the "Bounce House". He also has taken the child to "Chuck E. Cheese" and played video games with the child. *Id.* at 208. Mr. Matthews also that testified in the summer time, he plays Frisbee and soccer with the child. He also takes the child to hit some golf balls. In the winter, he and the child sleigh ride and build snowmen. *Id.* at 220 Mr. Matthews also testified that he takes the child horseback riding. *Id.* at 222.

Mother testified that Mr. Matthews and the child have a close bond and that they love each other. Mother testified that R.L.W. calls Mr. Mathews "Daddy" Mother testified that she and Mr. Matthews have another child together and Mr. Matthews treats R.L.W. and their son equally. *Id.* at 217 The maternal grandmother testified that she accompanies Mother, Mr. Matthews and the children on vacation. She testified that Mr. Matthews interacts with R.L.W. while on vacation and does many things with her. Ms. Lewis testified that Mr. Matthews has assumed the role of a father for R.L.W. *Id.* at 78.

12

Mr. Matthews testified that if he is permitted, he would be willing to adopt R.L.W. He also recognizes that he would be legally obligated to R.L.W. if the adoption is granted. *Id.* at 223 . Mother also understands that R.L.W. would have the right to inherit from Mr. Matthews and should Mr. Matthews adopt R.L.W., the child would be considered the same as his natural born child. *Id.* at 217

Father's counsel spent a significant amount of time cross examining Mother and Mr. Matthews on their decision at the time of the hearing not to tell R.L.W. that Mr. McCrum is her natural Father. The Court places no weight on Mother's and Mr. Matthew's decision on whether to advise R.L.W. of her biological father. The Court views this issue as a parental decision that has no bearing on the merits of the case. Mother and Mr. Matthews are not obligated by law to inform R.L.W. of her biological Father. Should they decide to do so, that is their decision and the Court will not interfere with their choice.

The Court further recognizes that in light of the fact that Father has not seen the now seven (7) year old child since she was six (6) months old, there is no bond existing between R.L.W. and Father.

## V. ADDITIONAL CONSIDERATIONS UNDER 23 P.A.C.S.A. SECTION 2511(b)

### A. ENVIRONMENTAL FACTORS

Title 23 Pa. C.S.A. Section 2511(b) specifies that a court may not terminate the parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent."

13

As "environmental factors beyond the control of "Father" was not the linchpin in granting the termination of Father's parental rights and because of the presence of other, independent factors utilized, this consideration does not apply and will not be addressed.

**B. NEEDS AND WELFARE OF THE CHILD**

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." This is to be a separate inquiry and even where the court has already considered the needs and the welfare of the child under one of the grounds of termination, the court must do so again. *In re Matsock*, 611 A.2d 738 (1992).

The Court has done this and finds the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the Court applies the same reasoning for concluding that these needs will be served by the termination of Father's parental rights.

**VI. CONCLUSION**

Finally, the Court notes that the Guardian *Ad Litem* for the child recommended that it is in the child's best interest to terminate the parental rights of Father to the minor child.

The Court finds that Father is not able to meet the child's best interests or needs as he has failed to perform parental duties as it relates to the minor child for a period far exceeding the statutory requirement. In stark contrast, Mr. Matthews has amply demonstrated that he continues to meet the child's physical, developmental and emotional needs and that the minor child has thrived under his care. The minor child

14

needs and deserves a permanent and stable father figure and terminating the parental rights of biological father serves the best interest of R.L.W.

Respectfully submitted,

BY THE COURT,

JENNIFER L. ROGERS                    J.

DATE: April 27, 2015

COPIES TO:

Gregory Skibitsky, Esq.
457 North Main Street
Suite 101
Pittston, PA 18640

Kristopher J. Januzzi, Esquire
46 Public Square
Suite 101
Wilkes-Barre, PA 18701

Lori Bowen, Esquire
216 N. River Street
Suite 560
Wilkes-Barre, PA 18702